| **Gonzalez v Lucido** |
|:---:|
| 2022 NY Slip Op 34846(U) |
| February 28, 2022 |
| Supreme Court, Kings County |
| Docket Number: Index No. 526175/2018 |
| Judge: Pamela L. Fisher |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 15 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse thereof at 360 Adams St., Brooklyn, New York on the 28th day of February 2022.

P R E S E N T:

HON. PAMELA L. FISHER,
J.S.C.

-------------------------------------------------------------X

ROBERT GONZALEZ and JOANNE GONZALEZ,

Plaintiffs,

**DECISION/ORDER**

- against -

Index No: 526175/2018

JEFFREY LUCIDO, DPM, NYU LANGONE
HOSPITALS and NYU LANGONE HEALTH
SYSTEM,

Defendants.

-------------------------------------------------------------X

Recitation, as required by CPLR §2219(a), of the papers considered in the review of this motion:

Papers Numbered

Notice of Motion/Cross Motion/Order to Show Cause and
Affidavits (Affirmations) Annexed_____           1-2, 3-4
Opposing Affidavits (Affirmations)_____           4, 5
Reply Affidavits (Affirmations)_____           5, 6

Upon the foregoing papers in this medical and podiatric malpractice action, plaintiffs move, pursuant to CPLR § 3212, for summary judgment on liability against defendants. Defendants cross move, pursuant to CPLR § 3212, for summary judgment, dismissing plaintiffs' complaint, and directing the entry of judgment in favor of defendants.

Plaintiffs commenced this action by filing a summons and complaint on or about December 31, 2018 (Defendants' Affirmation in Opposition and in Support of Cross Motion ¶ 5; Summons and Complaint, annexed as Exhibit C to defendants' motion papers, motion sequence 6). Issue was joined by Jeffrey Lucido, DPM, NYU Langone Hospitals, and NYU Langone Health System on or about January 28, 2019 (Defendants' Affirmation in Opposition and in Support of Cross Motion ¶ 5; Defendants' Answers, annexed as Exhibit D to defendants' motion papers, motion sequence 6). Issue

1

[* 1]

was joined by former defendants, "Juan Cortes, D.O. and his practice, Cortes Medical Care, P.C. on or about February 6, 2019" (Defendants' Affirmation in Opposition and in Support of Cross Motion ¶ 5). Plaintiffs served bills of particulars upon the current defendants on or about February 12, 2019, and upon the former defendants on or about March 13, 2019 (*Id.* at ¶ 6; Bills of Particulars, annexed as Exhibit E to defendants' motion papers, motion sequence 6). On April 19, 2019, plaintiffs served defendants with a letter "supplementing the bills of particulars" (*Id.*; Defendants' Affirmation in Opposition and in Support of Cross Motion ¶ 6). On July 20, 2020, the action was discontinued against Juan Cortes, D.O. and Cortes Medical Care, P.C. (*Id.* at ¶ 8; Stipulation of Discontinuance annexed as Exhibit P to defendants' motion papers, motion sequence 6). In their complaint and bills of particulars, plaintiffs allege that defendants departed from good and acceptable podiatric practice in their treatment of Mr. Gonzalez between February 28, 2018 and March 14, 2018, by "fail[ing] to immobilize the plaintiff's foot," "failing to advise and/or timely advise plaintiff to be non-weight bearing," "failing to hospitalize plaintiff for more aggressive treatment including intravenous medications" and antibiotics, neglecting to "monitor plaintiff on a more timely basis," "causing, permitting or allowing the aggravation of plaintiff's condition," failing [to] timely and/or properly" "recommend," "schedule, or take diagnostic tests," and neglecting to consult "with vascular, infectious and orthopedic specialists regarding plaintiff's condition" (Complaint ¶ 239; Verified Bill of Particulars as to Jeffrey Lucido, DPM ¶¶ 1, 2, 3; Verified Bill of Particulars as to NYU Langone Hospitals ¶¶ 3, 5, 10; Verified Bill of Particulars as to NYU Langone Health System ¶¶ 3, 5, 10). As a result of defendants' alleged malpractice, plaintiffs are claiming that Mr. Gonzalez sustained the following injuries: "[w]ound infection, abscess, cellulitis of the right foot, high fever, sepsis, septic shock," "[a]mputation of right leg through tibia and fibula," "[s]carring, [d]isfigurement," "[s]hock, depression, reactive depression, fear of additional amputations, psychological injuries, adjustment disorder with depressed mood, embarrassment, need for prosthesis, limp," and the need for "further surgical intervention, including

2

additional amputations, debridements, skin grafts and other surgical procedures" (Verified Bill of Particulars as to Jeffrey Lucido, DPM ¶ 4; Verified Bill of Particulars as to NYU Langone Hospitals ¶ 12; Verified Bill of Particulars as to NYU Langone Health System ¶ 12).

The following facts are not in dispute. On December 7, 2017, Mr. Gonzalez presented to his primary care physician, Dr. Cortes, complaining of "bilateral foot pain, bilateral toe pain and erythema of the first toe" (Rosenblum Expert Affidavit ¶ 8, annexed as Exhibit A to defendants' motion papers, motion sequence 6). Dr. Cortes prescribed "double strength Bactrim prophylactically in light of Mr. Gonzalez's complaints of pain and history of poorly controlled diabetes," and "referr[ed] [him] to podiatry" (*Id.*). On December 21, 2017, plaintiff arrived at Dr. Lucido's office "for evaluation of ingrown toenails with abscess" (*Id.*). Dr. Lucido recorded that the plaintiff had a history of "diabetes mellitus, high blood pressure, high cholesterol, and poor circulation," as well as "an extensive vascular history requiring 16 interventional angioplasties on his bilateral lower extremities" (*Id.*). Dr. Lucido's chart indicates that "Mr. Gonzalez took enalapril for high blood pressure and diabetic kidney disease," and "metformin for diabetes" (*Id.*). Dr. Lucido performed a vascular exam, which revealed "decreased or absent dorsalis pedis and posterior tibial pulses bilaterally, and a capillary refill time of three seconds" (*Id.*). Dr. Lucido also conducted a dermatologic exam, which showed "onychia (inflammation of the nail folds) of the bilateral hallux (big toe), and thick ingrown mycotic (fungal) nails on each of the patient's toes" (*Id.*). His "impression was peripheral vascular disease, abscess, and onychomycosis (fungal infection of the nail)" (*Id.*). Dr. Lucido "debrided Mr. Gonzalez's toenails, excising the infected borders and removing any spicules (embedded nail) before applying antibiotic dressing to both feet" (*Id.*). He "obtained" "[a] specimen" "for a fungal culture," and "Mr. Gonzalez was given instructions to remove the bandages that evening, and to perform prescribed wound care and foot soaks with Domeboro" (*Id.*). Dr. Lucido "referred Mr. Gonzalez for a consultation in vascular surgery" (*Id.*).

3

[* 3]

On January 2, 2018, plaintiff returned to "Dr. Cortes's office with a chief complaint of chest pain and lower back pain" (*Id.* at ¶ 9). Dr. Cortes performed a physical examination of the plaintiff, revealing "bilateral foot pain, bilateral toe pain, and erythema of his first digit (redness of the first toe), without any swelling" (*Id.*). Dr. Cortes prescribed "prophylactic double strength Bactrim, as well as the topical antibiotic cream Silvadene to apply to an abrasion on [plaintiff's] arm" (*Id.*). He also "referred Mr. Gonzalez to podiatry" (*Id.*). On January 10, 2018, Mr. Gonzalez was seen by "vascular surgeon, Dr. Farouk Marzouk at Frontier Medical Care PLLC (Frontier Medical)," and plaintiff complained of bilateral leg pain (*Id.*). The chart indicates that "[a] review of systems was negative except for leg pain, which Mr. Gonzalez described as occurring when walking one block" (*Id.*). Dr. Marzouk examined plaintiff's lower extremities, "not[ing] palpable bilateral femoral pulses, dopplerable popliteal pulses bilaterally, dopplerable anterior tibial and dorsalis pedis pulses on the right side only, and dopplerable posterior tibial pulse on the left side only" (*Id.*). Dr. Marzouk conducted a neurological exam, revealing "diabetic neuropathy with decreased sensation to the bilateral toes" (*Id.*). Dr. Marzouk examined Mr. Gonzalez's skin, noting "hair loss in the bilateral lower extremities, but no active ulcers or wounds [were] noted" (*Id.*). The records state that "[a]n arterial duplex scan was performed to assess peripheral occlusive disease in Mr. Gonzalez's legs," and the "results revealed severe arterial disease below both knees, with a significant decrease in waveforms" (*Id.*). Dr. Marzouk "recommended correlation with additional diagnostic studies" (*Id.*).

On January 18, 2018, Mr. Gonzalez arrived at Frontier Medical for "an aortogram and bilateral lower extremity angiograms" (*Id.* at ¶ 10). The tests showed "occlusion of the right anterior and posterior tibial arteries with multilevel stenosis of the right peroneal artery, and occlusion of the left anterior tibial artery and peroneal artery, and patent left posterior tibial artery, with multilevel stenosis" (*Id.*). On January 25, 2018, plaintiff returned to Dr. Marzouk at Frontier Medical, who performed an "atherectomy with balloon angioplasty in the left peroneal artery" on Mr. Gonzalez (*Id.*). The records

4

[* 4]

state that a "post-angioplasty angiogram of the left leg confirmed a good result, with tibial vessel runoff to his left foot and distal portion of the peroneal artery" (*Id.*). On February 2, 2018, Mr. Gonzalez returned to Frontier Medical, where he "underwent an atherectomy with balloon angioplasty on his right peroneal artery," which was "performed by Dr. Marzouk" (*Id.*). A pre-angioplasty angiogram was performed, which "confirmed that Mr. Gonzalez's right anterior and posterior tibial arteries were occluded," "his right peroneal artery was patent, and his common femoral, superficial femoral, and popliteal arteries were patent with multilevel calcified plaque" (*Id.*). A post-angioplasty angiogram was performed, "which confirmed that good blood flow was achieved to Mr. Gonzalez's right foot" (*Id.*). On February 20, 2018, plaintiff returned to Dr. Cortes's office "with complaints of right leg pain and swelling, and right big toe pain of six months' duration, both of which were exacerbated by physical activity" (*Id.* at ¶ 11). Mr. Gonzalez "also complained of bilateral eye pain and numbness and tingling in both hands and feet" (*Id.*). Dr. Cortes performed a physical examination of the plaintiff, which revealed "bilateral foot pain, right leg swelling, bilateral toe pain, and erythema of the first toe" (*Id.*). Dr. Cortes "prescribed Silvadene for an arm abrasion, and instructed Mr. Gonzalez to return in four weeks" (*Id.*).

On February 21, 2018, plaintiff presented to Frontier Medical for a "follow-up" appointment with Dr. Marzouk (*Id.*). Mr. Gonzalez complained of "bilateral leg and foot pain, which he described as beginning a few days earlier, and as being worse on his right side" (*Id.*). The chart states that a "review of systems was negative except for a complaint of leg pain" (*Id.*). An arterial duplex scan was performed, and "indicated patent bilateral common femoral, superficial femoral and popliteal arteries, a patent left posterior tibial artery and right dorsalis pedis artery, and bilateral tibial artery disease" (*Id.*). Dr. Marzouk wrote in his chart that "there was no arterial ischemia or pseudoaneurysm (blood vessel wall injury) in the groin that might explain Mr. Gonzalez's symptoms" (*Id.*). He "questioned whether there was some etiology going on in the patient's foot," and "instructed Mr. Gonzalez to see

5

Dr. Lucido before returning for follow-up" (*Id.*). On February 28, 2018, Mr. Gonzalez arrived at Dr. Lucido's office for a follow-up appointment, "with a chief complaint of right foot pain and swelling" (*Id.* at ¶ 12). The culture taken on December 21st "was positive for the fungus Trichophyton mentagrophytes" (*Id.*). The patient's chart indicates that a "general review of systems was unchanged since December 21st, including" "the patient's musculoskeletal system" (*Id.*). Plaintiff "presented with a red hot swollen right foot, which he reported began two days earlier" (*Id.*). An x-ray of plaintiff's right leg was taken, revealing a "subluxed talonavicular joint," and "Dr. Lucido's impression was closed dislocation of the right foot and Charcot arthropathy with midfoot breakdown due to diabetes mellitus" (*Id.*). Dr. Lucido ordered "a CT scan and a[n] MRI of [plaintiff's] right foot, and prescribed a 14-day-course of Augmentin prophylactically" (*Id.*).

On February 28, 2018, plaintiff also returned to Dr. Cortes's office "with a chief complaint of right leg swelling" (*Id.* at ¶ 13). A physical examination revealed "localized swelling, mass, and lump on his right leg" (*Id.*). Mr. Gonzalez did not have a fever, and his "extremities were without any ulcers, indurations, or openings" (*Id.*). Dr. Cortes documented that "Mr. Gonzalez reported right foot swelling for the past two weeks," that he "was taking Naproxen for pain, and was scheduled to undergo a CT scan and MRI as ordered by Dr. Lucido" (*Id.*). On March 5, 2018, plaintiff visited Dr. Cortes's office "for a cough with chest pain," and "[h]e also complained of right foot pain from a slip and fall one month earlier," "dizziness of one month['s] duration, joint pain caused by arthritis, and right foot pain, redness, and swelling" (*Id.*). Mr. Gonzalez did not have a fever, and a physical exam showed that "[h]is right foot was swollen and red in color, and no ulcers, indurations, or other signs of infection were noted" (*Id.*). Dr. Cortes "prescribed a ten-day course of Bactrim for the patient's foot, as well as Silvadene for his arm abrasion, and Duexis for arthritis" (*Id.*). On March 9, 2018, plaintiff "underwent a CT scan and MRI of his right foot," and the "findings were consistent with Charcot arthropathy, and indicated fracture and dislocation of the Chopart joint, marked fragmentation and dislocation of the

6

[* 6]

cuboid fracture and associated edematous change, and fluid collection along the plantar aspect of the midfoot measuring 3.3 x 0.3 x 1.9 cm, with no associated skin ulcer or sinus tract" (*Id.* at ¶ 14). The radiologists' report stated that the "fluid collection likely represented a hematoma, but abscess could not be excluded," and the "results of the CT scan were consistent with the MRI findings" (*Id.*).

On March 12, 2018, plaintiff returned to Dr. Cortes's office "with complaints of right leg pain and joint pain, stiffness, described as stabbing in nature, right foot cellulitis, and second digit swelling" (*Id.*). Mr. Gonzalez had no fever at this appointment (*Id.*). Dr. Cortes and plaintiff discussed the CT scan and MRI reports, and "in light of the cuboid fracture, Dr. Cortes referred Mr. Gonzalez to an orthopedist" (*Id.*). He also "instructed Mr. Gonzalez to continue taking Bactrim, and to continue treating with Dr. Lucido" (*Id.*). On March 14, 2018, Mr. Gonzalez had an appointment with Dr. Lucido, and they "discussed the March 9th diagnostic studies and the findings of Charcot foot of the midfoot, and a comminuted and displaced fractured cuboid" (*Id.* at ¶ 15). Mr. Gonzalez told Dr. Lucido that he was experiencing "numbness in his right foot, and that he did not have much feeling in his foot since taking painkillers" (*Id.*). Dr. Lucido recorded that "Mr. Gonzalez's right foot was unchanged from the prior visit but for increased edema and erythema, which was consistent with the diagnosed Charcot foot" (*Id.*). Dr. Lucido did not notice "any breaks in the skin on the foot" (*Id.*). Dr. Lucido advised "the patient that he had Charcot foot due to increased blood sugar and diabetes mellitus, and reiterated that he must stay non-weight bearing" (*Id.*). Dr. Lucido explained that "walking on a Charcot foot could lead to further breakdown of [plaintiff's] bone, and possibly amputation" (*Id.*). Dr. Lucido "immobilized" Mr. Gonzalez's foot "in a CAM boot," and plaintiff "was given crutches and a brochure for a knee walker" (*Id.*). Dr. Lucido filled out a "form for Mr. Gonzalez's employer, the New York Metro-Transit Authority, authorizing his need to stay home from work for eight weeks" (*Id.*). Plaintiff was directed to return to Dr. Lucido's office in six weeks (*Id.*). However, the plaintiff never returned to Dr. Lucido's office after this visit (*Id.*).

7

On March 25, 2018, plaintiff "presented to [the emergency department at] Good Samaritan Hospital in New Lebanon, Pennsylvania in a CAM walking boot with severe pain in his right foot" (*Id.* at ¶ 16). Plaintiff "reported developing an ulcer three days earlier on his right foot, and developing a fever and chills the day before" (*Id.*). An examination of plaintiff's right foot was conducted, and revealed that "Mr. Gonzalez's right foot was tender, warm, and red, with a two centimeter ulcer with a palpable abscess/fluid collection" (*Id.*). Mr. Gonzalez advised that "[i]n the preceding 24 hours," "he noticed a black discoloration and yellow spot on the plantar aspect of his right foot and oozing of serous fluid from the collection" (*Id.*). The chart indicates that "Mr. Gonzalez's serum glucose level was extremely elevated at 321," and "general and orthopedic surgery services were consulted" (*Id.*). Plaintiff "was diagnosed with sepsis, cellulitis, necrotizing soft tissue infection of the right foot, and severe diabetic foot ulcer with abscess" (*Id.*). Plaintiff was "admitted" to the hospital "for IV antibiotics, fluid resuscitation, and observation in anticipation of a right foot amputation and debridement of necrotic tissue" (*Id.*). The "[b]lood cultures drawn on March 25th grew Methicillin-sensitive Staphylococcus aureus, susceptible to Bactrim but not Augmentin" (*Id.*). On March 26, 2018, Dr. Kurt Graupensperger, D.O., an orthopedic surgeon, "performed a below-the-knee amputation on Mr. Gonzalez's right leg" (*Id.*). The operative report documents that "there was no evidence of osteomyelitis, and pathology confirmed necrosis and acute inflammation of the right leg soft tissue" (*Id.*). On March 29, 2018, plaintiff "was taken back to the operating room for debridement and formal closure of the wound" (*Id.*). Plaintiff "tolerated the procedures well, and remained at Good Samaritan Hospital through April 3, 2018" (*Id.*).

In support of their motion for summary judgment, plaintiffs submit an expert affirmation from Dr. Jeffrey B. Klein, D.P.M., a licensed podiatrist, who is "board certified in foot and ankle surgery," contending that Dr. Lucido deviated from acceptable podiatric practice in his treatment of Mr. Gonzalez, and that his deviations proximately caused the plaintiff's injuries (Plaintiffs' Expert

8

[* 8]

Affirmation ¶¶ 1, 11-14, 16-18, 21, 23, 24, 27-32, annexed as Exhibit A to plaintiffs' motion papers, motion sequence 5). Dr. Klein's opinion is based on review of the medical records and Dr. Lucido's deposition transcript, as well as his education, training, and experience (*Id.* at ¶ 3). Dr. Klein opines that Dr. Lucido departed from acceptable podiatric practice on February 28, 2018 by failing to immobilize plaintiff's foot, and provide him with an offloading device, such as "a mobility scooter, crutches, or a wheelchair" "to ensure that" Mr. Gonzalez was "non-weightbearing" (*Id.* at ¶¶ 11-13). Dr. Klein explains that after Dr. Lucido diagnosed Mr. Gonzalez with Charcot foot, the standard of care required complete immobilization of the foot, as the failure to treat this condition can cause the "joints in the foot [to] collapse," and "sores to develop," resulting in "infection and amputation" (*Id.* at ¶¶ 7-8). Dr. Klein points out that Dr. Lucido's chart from February 28, 2018, does not state that the "doctor immobilized the limb in any manner," or that the patient was "given any instructions regarding the care and treatment of his foot" (*Id.* at ¶ 10). Further, the records also do not mention that the patient was not given a CAM walking boot, because he had to drive home (*Id.* at ¶¶ 10, 16). Dr. Klein contends that even if the patient had to drive home, it was a deviation from the standard of care not to have provided him with the CAM boot, as "the patient should have been given the boot to wear before and after the drive home" (*Id.* at ¶ 16). Dr. Klein maintains that Dr. Lucido departed from acceptable podiatric practice on February 28, 2018 by not ordering that the CT scan and MRI be performed immediately, and "read emergently," given the diagnosis of Charcot foot and the x-ray results (*Id.* at ¶¶ 20-21). Further, he alleges that the failure to do these tests immediately, and to completely immobilize the patient's foot, caused Mr. Gonzalez's condition to worsen, evidenced by the results of the CT scan and MRI, which were performed on March 9, 2018 (*Id.* at ¶¶ 22-23). He explains that the "CT-scan and MRI taken on March 9, 2018, showed that the cuboid, that had only been displaced on the February 28, 2018 x-ray, now had a comminuted fracture with 'bony debris and bone fragmentation and significant displacement of the main fracture fragments, probably secondary to Charcot

9

[* 9]

arthropathy or trauma'" (*Id.* at ¶ 22). Based on these results, Dr. Klein concludes that the "failure to immobilize the foot at the February 28, 2018 visit caused the severe worsening of the patient's Charcot arthropathy," which "greatly decreased the patient's chances of recovery or limb salvage by, at least, 50% or more" (*Id.* at ¶ 23).

Dr. Klein claims that Dr. Lucido deviated from the standard of care by not "immediately contact[ing] [Mr. Gonzalez]" once he received the CT scan and MRI results, to tell him the results, advise him to be "completely non-weightbearing," and to set up an appointment for him to be "seen immediately" (*Id.* at ¶ 25). He also states that Dr. Lucido should have hospitalized Mr. Gonzalez, and ordered infectious disease consults on February 28, 2018, and March 9, 2018, given the diagnosis of Charcot foot, "plaintiff's diabetes, neuropathy, and poor circulation," as well as the results of the MRI, which "showed fluid collection along the plantar aspect of the mid-foot," and that "abscess [could not] be excluded" (*Id.* at ¶ 26). Dr. Klein indicates that "[i]mmediate hospitalization and infectious disease consultation would have helped in [the] diagnosis and treatment of an infection, or to consider incision for drainage, or emergency surgery" (*Id.* at ¶ 27). Further, "[a] vascular consultation would also have been beneficial to diagnose an acute vascular episode or a chronic vascular episode, and vascular intervention may have been recommended and helped him with limb salvage" (*Id.*). Dr. Klein opines that Dr. Lucido further deviated from the standard of care by not prescribing an antibiotic on March 14, 2018, as Dr. Lucido observed "increased redness and swelling," and the MRI results "showed fluid collection along the plantar aspect of the mid-foot," and that "abscess [could not] be excluded" (*Id.* at ¶ 29). Dr. Klein maintains that advising the patient to return in six to eight weeks at the March 14, 2018 visit, constituted a deviation from acceptable podiatric practice, as Dr. Lucido "should have been monitoring the plaintiff at least every few days to make sure the condition was not worsening," especially given the increased redness and swelling observed on March 14, 2018, and the MRI results

10

[* 10]

(*Id.* at ¶¶ 31-32). Dr. Klein concludes that Dr. Lucido's departures from accepted practice proximately caused Mr. Gonzalez's condition to worsen, resulting in "sepsis and leg amputation" (*Id.* at ¶ 32).

In opposition to plaintiffs' motion for summary judgment, and in support of their cross motion for summary judgment, defendants submit an expert affidavit from Dr. Barry Rosenblum, DPM, a duly licensed podiatrist, who is board certified in foot and ankle surgery, and an expert affirmation from Dr. George Todd, MD, a physician board certified in general surgery and vascular surgery (Rosenblum Expert Affidavit ¶¶ 2, 3; Todd Expert Affirmation ¶ 1, annexed as Exhibit B to defendants' motion papers, motion sequence 6). They contend that defendants did not deviate from acceptable podiatric practice in their treatment of Mr. Gonzalez, and that no act or omission of theirs proximately caused his injuries (Rosenblum Expert Affidavit ¶ 7; Todd Expert Affirmation ¶ 13). Defendants' expert opinions are based on review of the pleadings, bills of particulars, medical records, diagnostic studies, deposition transcripts, plaintiffs' motion papers, as well as their education, training, and experience (Rosenblum Expert Affidavit ¶ 4; Todd Expert Affirmation ¶ 2). Dr. Rosenblum alleges that Dr. Lucido appropriately treated Mr. Gonzalez on February 28, 2018 by prescribing a "14-day course of Augmentin," "refer[ring] Mr. Gonzalez for a CT scan and MRI to verify the diagnosis of Charcot foot, and for further assessment of the destruction of bone in his right foot," "instruct[ing] Mr. Gonzalez" "to stay off his" foot, and "offer[ing] [him] a CAM boot" (Rosenblum Expert Affidavit ¶ 19). Dr. Rosenblum argues that Dr. Klein's contentions that "Dr. Lucido should have ordered the CT scan and MRI emergently," and "should have followed up with Mr. Gonzalez by telephone upon learning that he had refused a CAM boot," are "without" "merit" (*Id.* at ¶ 20). Dr. Rosenblum opines that "Mr. Gonzalez's condition on February 28, 2018, was a result of a confluence of other chronic medical conditions which [he] had been managing, or mismanaging, for many years," and "[t]here was nothing about his presentation on February 28[th] that required immediate or emergent evaluation radiographically" (*Id.*). Further, Dr. Rosenblum maintains that Dr. Lucido was not required to call Mr.

11

[* 11]

Gonzalez after learning from his office staff that he had refused the CAM boot, as Mr. Gonzalez "was an adult patient without any cognitive deficits or limitations when he refused the CAM boot offered by Dr. Lucido's office" (*Id.*). He also suggests that Dr. Lucido did not deviate from the standard of care by not providing an offloading device on February 28, 2018, and contends that "crutches, a knee scooter and/or wheelchair were not necessary," on that date, and "would not have made a difference in [Mr. Gonzalez's] ultimate outcome" (*Id.*). Dr. Rosenblum bases this conclusion on the fact that "there was no progression in Mr. Gonzalez's condition between February 28, 2018, and March 14, 2018," as "there was" "no skin breakdown or infection in the foot" on March 14, 2018 (*Id.* at ¶¶ 20-21).

Dr. Rosenblum disagrees with Dr. Klein's opinion that "the breakdown in Mr. Gonzalez['s] foot worsened between the time of his x-rays in Dr. Lucido's office, and the additional studies performed on March 9, 2018" (*Id.* at ¶ 21). Although Dr. Klein claims that the MRI and CT scan results indicate that "the displacement of the cuboid had progressed to a comminuted fracture," between February 28, 2018, and March 9, 2018, Dr. Rosenblum explains that "CT scans and MRI studies are more sensitive than x-rays and provide more enhanced images of the area of the body being studied" (*Id.*). Therefore, he suggests that "[t]he different findings reported on the x-rays and on the MRI/CT studies [are] not an indication that Mr. Gonzalez's Charcot foot had worsened between the studies," but rather that "the more enhanced studies provided a higher level of detail in terms of where and how the patient's foot was breaking down" (*Id.*). Dr. Rosenblum contends that "even if there was further breakdown of Mr. Gonzalez's bones after February 28, 2018," there was still no infection in plaintiff's foot on March 14, 2018, as there were no "skin openings" at any of plaintiff's appointments with Dr. Cortes and Dr. Lucido between February 28, 2018, and March 14, 2018 (*Id.* at ¶¶ 21-22). Further, he maintains that had "Mr. Gonzalez's foot [been] infected," between February 28 and March 14, 2018, he "would [have] appeared visibly ill and would [have] quickly deteriorate[ed]," given his "poorly controlled diabetes and severe peripheral vascular disease" (*Id.* at ¶¶ 22, 28). Instead, Mr.

12

[* 12]

Gonzalez did not develop "an ulcer on his right foot" until "eight days after Mr. Gonzalez's third and last encounter with Dr. Lucido," and he did not develop "fever and chills" "until March 24, 2018," thereby indicating that his foot was not infected during the time period he received treatment from Dr. Lucido (*Id.* at ¶ 28).

Dr. Rosenblum claims that Dr. Klein's allegations that Dr. Lucido deviated from the standard of care by failing to immediately contact Mr. Gonzalez upon receipt of his CT scan and MRI results, "and provide further instructions based upon" the results, are "without merit" (*Id.* at ¶ 23). He states that the records indicate "that Dr. Lucido's office attempted to contact Mr. Gonzalez within 30 minutes of receiving his CT and MRI reports on March 9, 2018, and successfully moved his appointment up to an earlier date" (*Id.*). Further, Dr. Rosenblum affirms that "the patient had been told at the prior visit that it was important for him to be non-weight bearing, and he was already being kept out of work in order to stay off his foot" (*Id.*). Dr. Rosenblum contends that Dr. Lucido did not depart from acceptable podiatric practice by not prescribing an antibiotic on March 14, 2018, as the "CT scan and MRI confirmed the clear diagnosis of Charcot foot," and "the reported finding of a fluid collection on MRI is entirely consistent with Charcot foot" (*Id.* at ¶¶ 24-25). Although the radiologists documented that "abscess [could not] be excluded," Dr. Rosenblum opines that "there was no cause for concern since there was no evidence of infection in the absence of an opening in the skin to allow for the introduction of bacteria" (*Id.* at ¶ 25). Dr. Rosenblum maintains that Dr. Lucido adhered to the standard of care on March 14, 2018 by "thoroughly explain[ing] the diagnosis of Charcot foot, and what this entailed to Mr. Gonzalez, stressing again the importance of staying off his right foot for several weeks," "provid[ing] [him with] an official Doctor's Certification authorizing Mr. Gonzalez's leave from work for eight weeks," and giving him "a CAM boot, crutches, and a brochure for a knee walker" (*Id.*). Dr. Rosenblum acknowledges that there is a dispute as to whether plaintiff was advised to be "non-weight bearing" prior to March 14, 2018, but insists that this is "inconsequential," as

13

[* 13]

plaintiff's skin "was intact on" "March 14th" (*Id.* at ¶ 26). Therefore, Dr. Rosenblum concludes that "his weight-bearing status and/or immobilization of his foot between February 28th and March 14th had no role in the subsequent breakdown of his skin and infection that prompted his below-the-knee amputation on March 26, 2018" (*Id.*).

Dr. Rosenblum disagrees with Dr. Klein's opinion that Dr. Lucido "should have referred Mr. Gonzalez to the hospital for admission and/or treated him with IV antibiotics" between February 28, 2018, and March 14, 2018, or that he should have ordered consultations with specialists during that time period, as there was no evidence of infection (*Id.* at ¶ 27). Dr. Rosenblum contends that Dr. Lucido appropriately advised plaintiff to return in six weeks at the March 14, 2018 appointment, and disagrees with Dr. Klein's contention that plaintiff should have been instructed to return within 48 hours, as this would have been counterproductive to "the primary goal of Mr. Gonzalez staying off his feet and maintaining non-weight bearing status" (*Id.*). Dr. Rosenblum concludes that "Mr. Gonzalez's rapid deterioration and need for a below-the-knee amputation on March 26, 2018, were complications of his comorbidities, particularly his poorly controlled diabetes and his peripheral vascular disease, and were not in any way related or caused by his limited treatment with Dr. Lucido over the course of just three encounters" (*Id.* at ¶ 30).

Dr. Todd concurs with Dr. Rosenblum's opinion that "Dr. Lucido properly offered" "Mr. Gonzalez a CAM boot on February 28, 2018, but the patient refused it," and that "there was no need to order plaintiff's MRI and CT scan on an emergent basis on February 28, 2018" (Todd Expert Affirmation ¶¶ 14-15). Further, in light of the fact that plaintiff's "skin on the plantar surface of his right foot" was intact on March 14, 2018, Dr. Todd opines that "there was no need for hospitalization or intravenous antibiotics" on February 28, 2018, or March 14, 2018, and "no need for oral antibiotics on March 14, 2018" (*Id.* at ¶ 17). Dr. Todd agrees with Dr. Rosenblum's opinion that "if an infection had been present on March 14, 2018, or earlier, it would have manifested itself immediately and

14

rapidly progressed" "[g]iven Mr. Gonzalez's significant vascular issues, which necessitated multiple endovascular procedures" (*Id.* at ¶ 19). Dr. Todd acknowledges that "Mr. Gonzalez had a long history of diabetic foot problems and non-compliance," as documented in the records of his primary care physician, Dr. Cortes (*Id.* at ¶ 22). Dr. Todd maintains that "Mr. Gonzalez's failure to follow the recommendations of Dr. Cortes and other providers, as well as his failure to seek prompt medical attention, caused and contributed to the alleged injuries, including the deterioration of plaintiff's ulcer, foot, and medical condition" (*Id.*). Dr. Todd points out that Mr. Gonzalez had a serum glucose level of 321 mg/dL at Good Samaritan Hospital on March 25, 2018, indicating that he "failed to maintain good glycemic control" (*Id.* at ¶ 23). Dr. Todd explains that "[w]hen blood sugar control is poor, wound healing is impeded, and a patient is susceptible to rapidly progressive and life threatening infection," and "white blood cells cannot address an infection when the blood sugar is severely elevated" (*Id.*). Dr. Todd concludes that "the treatment rendered to Mr. Gonzalez prior to and on March 14, 2018, was consistent with the standard of care and did not cause the injuries alleged" (*Id.* at ¶ 27).

In reply, plaintiffs have submitted an additional affirmation from Dr. Jeffrey B. Klein, D.P.M., responding to defendants' expert opinions (Klein Reply Affirmation, annexed as Exhibit 1 to plaintiffs' reply papers). Dr. Klein reiterates that the "x-ray finding on February 28, 2018, required immediate immobilization and offloading," as "[a] Charcot foot predisposes the patient to infection," and continuing to walk on the foot "will cause further breakdown," increasing "the patient's risk of infection" and "amputation" (*Id.* at 1). Dr. Klein disagrees with defendants' experts' opinions that "the findings on the CT scan and MRI [were] the exact same findings as the x-ray" (*Id.* at 2). He contends that "[i]f the cuboid was fractured on February 28, 2018, the x-ray would have shown it," and it would have also shown "fractured fragments of the bones" if they were present on that date, as well as displacement (*Id.*). However, the x-ray showed that other than "abnormal alignment, the bones were" "intact and the articular surfaces were still maintained" (*Id.* at 1). Further, the "increased swelling and

[* 15]

redness" on March 14, 2018, confirms that plaintiff's Charcot foot had worsened between February 28, 2018, and March 14, 2018 (*Id.* at 2). Dr. Klein opines that "every step the patient took" "worsened the condition and lessened the chance of salvage," and that "by March 9, 2018, the process had so significantly worsened that the chance of salvage was very highly diminished" (*Id.* at 3). Dr. Klein reiterates that Dr. Lucido deviated from the standard of care by not prescribing antibiotics on March 14, 2018, in light of the increased redness and swelling on that date, the radiologists' finding of possible abscess, and Dr. Cortes's diagnosis of infection on March 12, 2018 (*Id.* at 6). Based on the progression of Mr. Gonzalez's condition, Dr. Klein maintains that Dr. Lucido should "have hospitalized Mr. Gonzalez" on March 14, 2018, and ordered infectious disease and vascular consults on that date (*Id.* at 3). Further, Dr. Klein alleges that Mr. Gonzalez should have at least been monitored every 48 hours "to make sure that there was no infection, and that any infection be caught early" (*Id.* at 3-4). He affirms that defendants' experts are mistaken that frequent monitoring would have been counterproductive to Mr. Gonzalez staying off his foot, as Mr. Gonzalez could have used a wheelchair or visited a closer doctor. Dr. Klein states that defendants' experts are incorrect when they state that Dr. Lucido did not proximately cause plaintiff's injuries, because there was no skin breakdown as of March 14, 2018, as "there is no question that a Charcot foot predisposes to infection" (*Id.* at 4). He concludes that the "failure to at least try to arrest that process by immobilization on February 28, 2018, deprived the patient of the chance to avoid further deformity of the foot" (*Id.*).

In further support of their cross motion for summary judgment, defendants reiterate that they did not deviate from acceptable podiatric practice during their treatment of Mr. Gonzalez, and that they did not proximately cause his injuries (Reply Affirmation in Support of Cross-Motion for Summary Judgment ¶ 4). Defendants argue that the negligent hiring and vicarious liability claims must be dismissed, as plaintiffs have failed to oppose that relief (*Id.* at ¶ 6). Defendants contend that plaintiffs did not raise a triable issue of fact, as their expert "has failed to show the requisite nexus between the

16

[* 16]

alleged malpractice and the amputation of Mr. Gonzalez's right leg below the knee," because he "is unable to describe the exact moment or mechanism by which the infection entered the body" (*Id.* at ¶ 15).

To prevail on a cause of action for medical [or podiatric] malpractice, the plaintiff must prove that defendant "deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries" (*Stukas v. Streiter*, 83 AD3d 18, 23 [2d. Dept. 2011]; *Paone v. Lattarulo*, 123 AD3d 683, 683 [2d. Dept. 2014]). On a motion for summary judgment, defendant must "make a prima facie showing that there was no departure from good and accepted medical [or podiatric] practice or that the plaintiff was not injured thereby" (*lulo v. Staten Is. Univ. Hosp.*, 106 AD3d 696, 697 [2d. Dept. 2013]; *Paone*, 123 AD3d at 684; *Parrilla v. Saphire*, 149 AD3d 856, 857 [2d. Dept. 2017]). Once the defendant meets its burden, the burden then shifts to the plaintiff to "raise a triable issue of fact with respect to the element of the cause of action or theory of nonliability that is the subject of the moving party's prima facie showing" (*Stukas*, 83 AD3d at 24). If the defendant "makes only a prima facie showing that he or she did not deviate or depart from accepted medical [or podiatric] practice, the plaintiff, in order to defeat summary judgment, need only raise a triable issue of fact as to the alleged deviation or departure, and need not address the issue of proximate cause" (*Hayden v. Gordon*, 91 AD3d 819, 821 [2d. Dept. 2012]). Conclusory allegations that are "unsupported by competent evidence tending to establish the essential elements of medical [or podiatric] malpractice are insufficient to defeat defendant physician's summary judgment motion" (*Deutsch v. Chaglassian*, 71 AD3d 718, 719 [2d. Dept. 2010]). Where the parties have submitted conflicting expert reports, summary judgment should not be granted; "[s]uch credibility issues can only be resolved by a jury" (*Id.*).

Ordinarily, a hospital may not be held vicariously liable for the "negligent treatment provided by an independent physician" who is "retained by the patient" (*Cynamon v. Mount Sinai Hospital*, 163

17

[* 17]

AD3d 923, 924 [2d. Dept. 2018]; *Corletta v. Fischer*, 101 AD3d 929, 930 [2d. Dept. 2012]). Further, "[w]here hospital staff, such as resident physicians and nurses, have participated in the treatment of the patient, the hospital may not be held vicariously liable for resulting injuries where the hospital employees merely carried out the private attending physician's orders" (*Cynamon*, 163 AD3d at 924; *Doria v. Benisch*, 130 AD3d 777, 777 [2d. Dept. 2015]). There are three exceptions to this rule, and a hospital is not "shield[ed]" "from liability" "when (1) the staff follows orders despite knowing that the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders; (2) the hospital's employees have committed independent acts of negligence; or (3) the words or conduct of the hospital give rise to the appearance and belief that the physician possesses the authority to act on behalf of the hospital" (*Cynamon*, 163 AD3d at 924-25; *Doria*, 130 AD3d at 777-78).

Here, defendants met their prima facie burden on their motion for summary judgment. Defendants' experts, Dr. Rosenblum and Dr. Todd, affirmed that Dr. Lucido did not deviate from acceptable podiatric practice in his treatment of the plaintiff, and that he did not proximately cause the plaintiff's injuries. They maintain that Dr. Lucido appropriately treated Mr. Gonzalez on February 28, 2018, by prescribing antibiotics, offering him a CAM boot, advising him to stay off his foot, and ordering a CT scan and MRI of his right foot. Further, they opine that Dr. Lucido adhered to the standard of care on March 14, 2018, by providing plaintiff with a CAM boot and crutches, advising plaintiff to stay off his foot, and directing him to return in six weeks. Dr. Rosenblum and Dr. Todd conclude that plaintiff's amputation was not proximately caused by the treatment rendered by Dr. Lucido, as plaintiff's skin was intact on March 14, 2018, the last day Dr. Lucido saw the plaintiff. Their opinions constitute competent evidence, in that they are based on the pleadings, bills of particulars, medical records, diagnostic studies, deposition transcripts, plaintiffs' motion papers and their own training and experience.

18

[* 18]

In opposition and in support of their own motion for summary judgment, plaintiffs produced affidavits of merit from Dr. Klein, a licensed podiatrist who is board certified in foot and ankle surgery, attesting to departures from accepted standards of podiatric practice, and that these departures were a competent producing cause of the plaintiff's injuries. Dr. Klein contends that Dr. Lucido deviated from the standard of care on February 28, 2018, by failing to immobilize plaintiff's foot, provide him with an offloading device, and order that the CT scan and MRI be performed emergently. Further, he opines that Dr. Lucido departed from acceptable practice on March 14, 2018, by failing to prescribe antibiotics, hospitalize the plaintiff, order vascular and infectious disease consults, and by not directing that the plaintiff return every few days so that his condition could be monitored. Plaintiffs' expert opinion, based on review of the medical records, Dr. Lucido's deposition transcript and defendants' expert opinions, raises triable issues of fact as to the cause of action for podiatric malpractice with respect to Dr. Lucido. Due to the conflicting expert reports, Dr. Lucido's motion for summary judgment is denied as to the causes of action for podiatric malpractice and loss of consortium (*See Deutsch*, 71 AD3d at 719). As plaintiffs have failed to oppose dismissal of the negligent hiring, training and supervision claim pleaded in paragraph 239 of the complaint, this claim is hereby dismissed.

NYU Langone Hospitals' and NYU Langone Health System's motion for summary judgment is granted, as the affidavit of Michael Browdy, the Director of Insurance at NYU Langone Health System, establishes that Dr. Lucido was not employed by NYU Langone Hospitals or NYU Langone Health System (Browdy Affidavit, annexed as Exhibit Q to defendants' motion papers, motion sequence 6). Since Dr. Lucido was an independent physician, the hospital is not vicariously liable for any alleged malpractice committed by him (*Cynamon*, 163 AD3d at 924; *Corletta*, 101 AD3d at 930). Further, although Mr. Browdy's affidavit does not discuss the employment of Dr. Lucido's office staff, Dr. Lucido's staff was acting pursuant to Dr. Lucido's directives, and plaintiffs have failed to

19

[* 19]

demonstrate that the staff committed independent acts of malpractice, or that Dr. Lucido's orders were "so clearly contraindicated" that the staff should have intervened (*Cynamon*, 163 AD3d at 924-25; *Doria*, 130 AD3d at 777-78). Therefore, all claims against NYU Langone Hospitals and NYU Langone Health System are hereby dismissed, and the Clerk of the Court is directed to enter judgment in favor of NYU Langone Hospitals and NYU Langone Health System. As triable issues of fact remain, plaintiffs' motion for summary judgment is denied in its entirety.

Defendants' motion for summary judgment is granted in part and denied in part. The negligent hiring, training, and supervision claim is dismissed, and all claims against NYU Langone Hospitals and NYU Langone Health System are dismissed. Plaintiffs' motion for summary judgment is denied.

This constitutes the decision and order of the Court.

ENTER:

_____

Hon. Pamela L. Fisher
J.S.C.

20